**GARTLAND STEAMSHIP COMPANY, Libellant,**

v.

**GREAT LAKES DREDGE & DOCK COMPANY, Respondent.**

**No. 3602.**

United States District Court
N. D. Ohio, E. D.

Feb. 5, 1958.

Lucian Y. Ray, McCreary, Hinslea & Ray, Cleveland, Ohio, for libellant.

J. Harold Traverse, Cleveland, Ohio, for respondent.

JONES, Chief Judge.

About noon on July 5, 1955 the Tug McGuire, 77 feet in length, 23 feet in width, with a light draft of about 9.9 feet was moving up the Cuyahoga River astern of the Sullivan Brothers, a bulk steel freighter 437 feet in length, 50 feet beam and an average draft of 21.5 feet, loaded with 7,400 tons of iron ore. The libellant alleges that the Tug, without giving the required signal and securing response, undertook to pass the Sullivan Brothers at Center Street Bridge as they were passing through the draw 113 feet wide; that in some way the Tug appeared to get out of control, fetching up hard against the channel piling and bouncing off, sheering forcibly into the starboard side of the Sullivan Brothers some 90 to 100 feet forward of her stern, or between the 12th and 13th hatches, damaging two of her plates and an inside supporting frame, and perhaps other

damage. The respondent concedes the attempted passing without signal or response but claims that the passing was made at the B. & O. Railroad Bridge with 161 feet draw, five or six hundred feet down the River from the Center Street Bridge, and, while it admits collision with the Sullivan Brothers, denies that it was with any appreciable force or resulting damage.

While there were many details and distances related in evidence as to the relative speeds, movements and positions of the Sullivan Brothers and the Tug McGuire as the events progressed and culminated in the contact, it is not thought necessary for me to review them, or to undertake to analyze or reconcile conflicting testimony on the issues of fact. It will be sufficient to state that I have given careful consideration to them, satisfactory to myself, in resolving the issues and to set down my findings and conclusions.

Respondent seeks to exonerate its Tug McGuire in whole or in part from the consequences of its initial fault in giving no passing signal to the libellant's vessel the Sullivan Brothers. It asserts that had the Sullivan Brothers cooperated, as it should have, despite the violation of the passing rule, the McGuire could have negotiated the passing in safety; that such failure so to cooperate, and by giving an unnecessary wheel at a time when the McGuire was known to be passing, was the direct or contributing cause of the collision.

I am unable to find that the Sullivan Brothers in any way contributed to the collision, or that it failed to take any measures in its navigation that it should have taken to avoid the consequences of the McGuire's self-imposed predicament. In the exercise of good and safe navigation the McGuire must be charged with knowledge of the perils of propeller currents such as vessels of the Sullivan Brothers' size would produce in a narrow and shallow channel. Following the stern for so long, the McGuire must have known that the Sullivan Brothers was working its engines, not only to back and

fill around Superior Bend, but to maintain its speed and steerageway.

The Sullivan Brothers was not required to assume that the McGuire was intending to pass her in the B. & O. draw, or that of the Center Street. In such failure upon its part, the Tug had no right to assume that the Sullivan Brothers would not kick her stern one way or the other in keeping straight with its necessary course up the River.

The rule clearly gives the vessel ahead the right to determine whether an overtaking vessel shall pass; and the overtaking vessel must keep out of the way. This would be more especially forceful of application where no signals were given or exchanged.

The tow-line Tug Nebraska was not pulling the Sullivan Brothers but was assisting in keeping it in the channel and on the required course up the River.

While I have great respect for Captain Murray's experience and knowledge of navigation in the rivers, I do not share his opinion based upon the assumed facts, that the Tug McGuire must have come up against the ship's starboard side, as he thought, with light contact and little force.

The McGuire's navigation was faulty from the failure to give the passing signal and to secure a response from the Sullivan Brothers. What happened afterward was, in my opinion, bad judgment and unsafe navigation in electing to pass the Sullivan Brothers under the circumstances, and this would be so whether it was at the B. & O., or the Center Street draw. This view was fortified by Captain Roche's testimony of his navigation of the McGuire. As I said in another place, he was charged with the knowledge of currents involved in such situation and which he, in his testimony, gave as the cause of his losing control of the Tug and coming into collision with the Sullivan Brothers. This was a condition that was well known to the Tug McGuire, and quite obvious. I think neither draw was satisfactory for a passing without a signal and favorable response from the Sullivan Bros. The B. & O. draw was the less desirable of the two because of the currents to be anticipated and which were obvious by reason of the working of the propellers of a large ship like the Sullivan Brothers, in backing and filling to make the turn in the Superior Bend for the straight away up the River.

While there is sharp conflict between the vessels as to the place of passing, I find it more likely that the McGuire attempted the passing at the Center Street draw, which was well into the straight away. At the B. & O. Bridge there was more water, but the Sullivan Brothers would hardly have finished her backing and filling in the Superior Bend, creating more propeller current in lining up for the B. & O. draw, than she would have been using her wheel at the Center Street Bridge. Conditions and effects of currents generated by the propeller of the Sullivan Brothers in backing and filling at the Superior Bend below the B. & O. draw must be charged to have been within the knowledge of, and understood by, the Tug McGuire in undertaking to pass the Sullivan Brothers if that were where it occurred.

Attempting a passing of a ship the size of the Sullivan Brothers at either draw without a signal and a favorable response would constitute unsafe navigation.

Considering the evidence as to the movements and conduct involved in the navigation of the McGuire preceding and leading up to the disasterous consequences it seems to me to be more consistent with a finding that its unannounced passing of the Sullivan Brothers was undertaken in the narrower draw at the Center Street Bridge (113 feet) than through the wider draw of the B. & O. Railroad Bridge (161 feet).

There is the final sharp issue between the parties as to the damage directly caused by the collision of the McGuire with the starboard side of the Sullivan Brothers. The libellant's evidence was to the effect that the damage was found to two plates, characterized as a two and a

half inch indentation over a space of about three feet in diameter and that an inner frame or support structure was bent or buckled. These conditions were identified at the surveys in Buffalo and Milwaukee as to the point where the contact took place. While the respondent's Superintendent of Repairs Rezi, at Buffalo, inspected and substantially confirmed the damage alleged to have been caused by the contact, the respondent contends that the extensive damage could not have been inflicted by the McGuire. Superintendent Rezi testified that as a practical matter, under the assumed facts as to speed, control, angle and point of contact, no damage such as found by him upon inspection at Buffalo could have resulted from the striking by the McGuire.

Anton Kaufmann, Naval Architect of the Defoe Shipyard, Saginaw, Michigan, studied the matter and made written calculations (offered in evidence) as to what speed, direction and force would be required by the Tug McGuire to cause the damage claimed by the libellant. Under the assumed facts of the respondent's hypothetical question it was his opinion that no such damage could have been done by the McGuire; and that if any such damage had been inflicted there would have been considerable damage to the port bow of the McGuire, which, under the evidence was not the case.

It does seem difficult to believe that the collision, even accepting the force of the contact as characterized by the libellant's evidence, caused such extensive damage to the starboard side of the Sullivan Brothers as claimed by the libellant. But, under interrogatories filed by the respondent, the libellant disclosed the Sullivan Brothers' five-year history as to previous accidents, or damage, none of which had occurred at the same part of the vessel and all such damage had been repaired.

Captain Hjerpe of the Sullivan Brothers examined the point of contact immediately on tying up at the Defense Dock, and described the indentation and its location between numbers 12 and 13 hatches, about ninety feet forward from the stern of his ship. He saw bits of rope fiber attached to the steel of his ship at that point. The Tug had a hemp fender at the port bow; he saw flaked-off paint and a bent frame on the inside.

Clegg, Second Mate on the Sullivan Brothers, testified that he saw the McGuire "bounce off" the Center Street Bridge abutment, which made her sheer sharply toward the Sullivan's starboard side at a thirty to forty degree angle; although he did not actually see the contact, he observed the indentation in the hull between the 12th and 13th hatches; saw strands of hemp on the steel; looked in the hatch and saw the paint off and then reported to the Captain.

Balik, First Assistant Engineer of the Sullivan Brothers, noticed the Tug come charging up the Center Street draw, three or four times as fast as the Sullivan Brothers; testified that the Tug seemed to loose control and then bounced off the Center Street Bridge abutment and sheered over against the Sullivan at a diagonal of forty-five degrees. He saw the contact between the 12th and 13th hatches; examined the hull afterward and saw the cave-in at the bottom of the top plate, two to three inches—in his opinion it looked "dished-in like a saucer" three feet in diameter.

For the respondent, as to the nature of the contact and damages, Captain Roche of the McGuire testified that after bouncing off the cluster piling (which he said was at the B. & O. draw), the McGuire, heeling over some, drifted slowly toward the Sullivan Brothers, the fender on the port bow of the Tug colliding with the starboard side of the Sullivan Brothers, with what he characterized as a "very light touch—no impact".

Captain Roche further testified that Second Mate Clegg of the Sullivan Brothers told him that nothing was damaged and that he (Clegg) did not bother to look at it.

Chief Engineer Healey of the McGuire testified that he saw no damage to the Sullivan Brothers and that there was no damage at all to the McGuire.

Finnerty, the Deck Hand, testified that after the Tug bounced off the piling on its starboard side it moved slowly away toward the Sullivan Brothers. He saw no evidence of damage to the Sullivan Brothers and there was no damage to the Tug.

Patton, the Oiler, said he "felt no jar —and there was just a scrape against the Sullivan Brothers".

Keeling, the Army Engineers' Inspector in the pilot house of the Tug testified that the contact was "not a severe bump"; that the Tug brushed the side of the Sullivan Brothers and he saw no damage.

From these materially conflicting stories it is necessary to determine as to the reasonable probabilities. Under this testimony and the physical situation, events and consequences depicted by the evidence I find that the McGuire was endeavoring to pass the Sullivan Brothers at an unsafe place and speed, without giving a passing signal and securing a response, considering the knowledge with which its Master must be charged as to the position and movements of the Sullivan Brothers in maintaining its headway and steerageway and the propeller currents to be anticipated at the draw of the Center Street Bridge. The fact of the force with which the McGuire must have hit the abutment on its starboard side, sufficient to bounce it off and cause it to sheer sharply over against the starboard side of the Sullivan Brothers; and the fact that the McGuire, with its pilot wheel spinning, was out of control, lead me to the conclusion that the contact was probably severe enough to cause the damage as claimed. Propeller currents and the wash of the Sullivan Brothers may have been factors, but they were not enough to account for the speed and the force of the McGuire's movement in the draw and over against the starboard side of the Sullivan Brothers.

I find and conclude that the respondent's Tug McGuire was solely at fault, directly bringing about the collision and resulting damage to libellant's Sullivan Brothers.

If, in addition to this memorandum, either party believes that special findings of fact and separate conclusions of law are required under Admiralty Rule 46½, 28 U.S.C.A., the libellant may prepare and propose them for consideration and adoption, after serving a copy upon respondent's proctor.